1  KHAI LEQUANG (SBN 202922)
   klequang@orrick.com
2  MELANIE D. PHILLIPS (SBN 245584)
   mphillips@orrick.com
3  ORRICK, HERRINGTON & SUTCLIFFE LLP
   777 South Figueroa Street
4  Suite 3200
   Los Angeles, California  90017
5  Telephone:  213-629-2020
   Facsimile:   213-612-2499
6
   STEPHEN G. FORESTA (admitted *pro hac vice*)
7  sforesta@orrick.com
   PHILIPP SMAYLOVSKY(admitted *pro hac vice*)
8  psmaylovsky@orrick.com
   ORRICK, HERRINGTON & SUTCLIFFE LLP
9  51 West 52nd Street
   New York, NY 10019
10 Telephone:  212-506-5000
   Facsimile:   212-506-5151
11
   Attorneys for Plaintiff
12 U.S. BANK NATIONAL ASSOCIATION, AS SECURITIES
   INTERMEDIARY FOR LIMA ACQUISITION, LP
13
                 UNITED STATES DISTRICT COURT
14
                 CENTRAL DISTRICT OF CALIFORNIA
15
                      WESTERN DIVISION
16

17
18 U.S. BANK NATIONAL                  Case No. CV 11-09517 ODW (RZx)
   ASSOCIATION, as securities
19 intermediary for Lima Acquisition,  **DISCOVERY MATTER**
   LP
20                                      **JOINT STIPULATION FOR
              Plaintiff,                PLAINTIFF'S MOTION TO
21                                      COMPEL PRODUCTION OF
       v.                               DOCUMENTS AND RESPONSE TO
22                                      INTERROGATORY**
   PHL VARIABLE INSURANCE
23 COMPANY, a Connecticut              **[LOCAL RULE 37-2.1]**
   corporation,
24                                      Fact Discovery Cutoff:  TBD
              Defendant.                Pretrial Conference:  TBD
25                                      Trial Date: TBD

26                                      Date Action Filed:  November 16, 2011
27
28

# TABLE OF CONTENTS

Page

I.    INTRODUCTORY STATEMENTS ............................................................... 1
      A.    Plaintiff and Moving Party's Introductory Statement ......................... 1
      B.    Defendant and Opposing Party's Introductory Statement ................... 4

II.   PHOENIX HAS FAILED TO PRODUCE DOCUMENTS IN A
      TIMELY MANNER ...................................................................................... 6
      A.    Plaintiff and Moving Party's Contentions ........................................... 6
      B.    Defendant and Opposing Party's Contentions ..................................... 8

III.  PHOENIX REFUSES TO PRODUCE DOCUMENTS
      CONCERNING THE IMPROPER REASONS IT RAISED COST OF
      INSURANCE RATES ON ITS EXISTING POLICYHOLDERS ................ 8
      A.    Discovery Requests and Responses at Issue:  73 and 76-78 .............. 8
            1.    Plaintiff and Moving Party's Contentions ............................... 10
                  a.    The Relevant Requests Seek Relevant Information
                        About the Real, Impermissible Reasons Phoenix
                        Raised Cost of Insurance Rates .................................... 13
                  b.    Plaintiff Has Met and Conferred With Phoenix ............ 18
            2.    Defendant and Opposing Party's Contentions ......................... 20

IV.   PHOENIX HAS FAILED TO PROVIDE A COMPLETE RESPONSE
      TO INTERROGATORY NO. 1 ................................................................... 22
      A.    Discovery Requests and Responses at Issue:  1 ................................ 22
            1.    Plaintiff and Moving Party's Contentions ............................... 24
            2.    Defendant and Opposing Party's Contentions ......................... 26

V.    THE COURT SHOULD ORDER PHOENIX TO REIMBURSE
      PLAINTIFF'S EXPENSES IN BRINGING THIS MOTION ..................... 28
      A.    Plaintiff and Moving Party's Contentions ......................................... 28
      B.    Defendant and Opposing Party's Contentions .................................... 29

1

**<u>TABLE OF AUTHORITIES</u>**

2

3

**CASES**

4

*Aliotti v. Vessel Senora*,
    217 F.R.D. 496 (N.D. Cal. 2003) ................................................................. 30

5

6

*Ayers v. Cont'l Cas. Co.*,
    240 F.R.D. 216 (N.D. W. Va. 2007) ............................................................ 29

7

8

*Cochran v. City of Huntington*,
    No. 1:05-CV-249, 2006 U.S. Dist. LEXIS 39516 (N.D. Ind. Mar. 31,
    2006) ................................................................................................................. 7

9

10

*David v. Hooker*,
    560 F.2d 412 (9th Cir. 1977) ....................................................................... 28

11

12

*Davis v. Circuit City Stores, Inc.*,
    06-04804 (DDP), 2010 U.S. Dist. LEXIS 37464 (C.D. Cal. Apr. 14, 2010) ...... 14

13

14

*Egan v. Mutual of Omaha Ins. Co.*,
    24 Cal. 3d 809 (1979) .................................................................................. 16

15

16

*Evans v. Tilton*,
    2010 U.S. Dist. LEXIS 47328 (E.D. Cal. Apr. 20, 2010) ........................... 25

17

18

*First Tennessee Bank Nat. Ass'n v. Republic Mortg. Ins. Co.*,
    276 F.R.D. 215 (W.D. Tenn. 2011) ....................................................... 17, 18

19

20

*Gargano v. Heyman*,
    203 Conn. 616 (1987) .................................................................................. 18

21

22

*Global Ampersand, LLC v. Crown Eng'g & Const., Inc.*,
    261 F.R.D. 495 (E.D. Cal. 2009) ................................................................. 29

23

24

*Insurance Co. of State of Pa. v. City of San Diego*,
    02CV693BEN(CAB), 2008 WL 926560 (S.D. Cal. Apr. 4, 2008) ................ 16

25

26

*J&M Assocs., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*,
    No. CV 06-903, 2008 WL 638137 (S.D. Cal. Mar. 4, 2004) ...................... 30

27

*Jackson v. Montgomery Ward & Co., Inc.*,
    173 F.R.D. 524 (D. Nev. 1997) .............................................................. 20, 26

28

*Kirschenman v. Auto-Owners Ins.*,
    280 F.R.D. 474 (D.S.D. 2012) ........................................................ 17

*Koninklijke Philips Electronics N.V. v. KXD Technology, Inc.*,
    No. CV 05-1532, 2007 WL 778153 (D. Nev. Mar. 12, 2007)................................. 28

*Neal v. Farmers Ins. Exch.*,
    21 Cal. 3d 910 (1978).................................................................. 16

*Nugget Hydroelectric, L.P. v. Pac. Gas & Elec. Co.*,
    981 F.2d 429 (9th Cir. 1992)............................................................ 20

*Oneok, Inc. v. Nat'l Union Fire Ins. Co.*,
    06-CV-200GKFSAJ, 2007 WL 2891519 (N.D. Okla. Sept. 28, 2007)............... 16

*Regan-Touhy v. Walgreen Co.*,
    526 F.3d 641 (10th Cir. 2008)......................................................... 28

*Rivera v. Nibco, Inc.*,
    364 F.3d 1057 (9th Cir. 2004).......................................................... 21

*Schwartz v. State Farm Fire & Cas. Co.*,
    88 Cal. App. 4th 1329 (2001).................................................. 15, 16, 18

*Sevey v. Soliz*,
    2011 U.S. Dist. LEXIS 71620 (N.D. Cal. July 2, 2012) ......................... 24

*United Technologies Corp. v. Am. Home Assur. Co.*,
    118 F. Supp. 2d 174 (D. Conn. 2000) .............................................. 18

*Votto v. Am. Car Rental, Inc.*,
    273 Conn. 478 (2005) ................................................................ 18

**OTHER AUTHORITIES**

Fed. R. Civ. Proc. 33(b)(1)(B) .......................................................... 24

Fed. R. Civ. Proc. 37 .................................................................. 1, 29

Fed. R. Civ. Proc. Rule 26(b)(1) ............................................... 1, 6, 14

Local Rule 37-2 ..................................................................... 1, 4

1   Pursuant to Federal Rules of Civil Procedure Rules 26 and 37, and Local
2   Rule 37-2, plaintiff U.S. Bank National Association, as securities intermediary for
3   Lima Acquisition LP ("Plaintiff"), respectfully moves the Court for an order:
4   1.   Compelling defendant PHL Variable Insurance Company ("Phoenix")
5   to produce all documents in accordance with its responses to Plaintiff's First Set of
6   Request for Documents within 30 days of the Court's order compelling production;
7   2.   Compelling Phoenix to produce documents in response to Request
8   Nos. 73, 76-78 in Plaintiff's First Set of Requests for Documents;
9   3.   Compelling Phoenix to provide a full and complete response to
10   Interrogatory No. 1 in Plaintiff's First Set of Interrogatories; and
11   4.   Awarding Plaintiff its reasonable fees and costs incurred in bringing
12   this motion.

13   **I.**   **INTRODUCTORY STATEMENTS**

14   **A.**   **Plaintiff and Moving Party's Introductory Statement**

15   It has been **six months** since Plaintiff served its First Set of Requests for
16   Production of Documents (the "RFPs"), and as of the date of this Stipulation,
17   Phoenix, by its own admission, still has not produced a single document from its
18   searches for electronically-stored information ("ESI").  For **over two years now**,
19   policyholders, state regulators, and trade organizations have been asking Phoenix to
20   produce documents supporting its cost of insurance rate increases, and Phoenix has
21   refused to do so, claiming the documents are confidential and proprietary.  Now
22   that Phoenix has been sued for breach of contract (and other claims), Phoenix has
23   no excuse for not producing these documents immediately.  Yet Phoenix has taken
24   months just to trickle out incomplete, piecemeal productions that fail to identify and
25   describe all of Phoenix's original and current pricing assumptions, which are
26   fundamental to evaluating Phoenix's stated justifications for raising the cost of
27   insurance rates on Plaintiff's and hundreds of other policies.  Accordingly, the
28   Court should order Phoenix to complete its production within 30 days, which would

1   be approximately **eight months** from the date the RFPs were served.

2          Furthermore, Phoenix has improperly refused to produce relevant documents

3   about the Company's dire financial situation during the year and a half before it

4   raised cost of insurance rates.  Between 2008 and 2009, Phoenix lost hundreds of

5   millions of dollars from investments in subprime residential mortgage-backed and

6   other asset-backed securities, causing insurance rating agencies to downgrade

7   Phoenix's credit ratings and their future outlook for the Company.  In addition, two

8   of Phoenix's main distributors – State Farm and National Life Group – announced

9   they would no longer sell Phoenix products as a result of the Company's poor

10  financial condition.  Phoenix's huge losses, and the ensuing rating agency

11  downgrades, led to questions about the Company's solvency, the adequacy of its

12  reserves to pay future claims, and the ability of the Company to generate sufficient

13  revenue from new sales of life insurance to stay in business.  One year later,

14  Phoenix began raising the cost of insurance rates on its existing policyholders.

15         These rate increases were clearly designed to recoup some of Phoenix's

16  massive investment losses as the Company dangled on the verge of insolvency with

17  its stock price closing at an all-time low of $0.29 per share in March 2009.  In fact,

18  by raising cost of insurance rates on its existing policyholders, Phoenix used these

19  policyholders to replace the revenue Phoenix could no longer generate from new

20  sales of life insurance as a result of credit rating agency downgrades (which raised

21  serious doubts about the Company's ability to meet its future obligations).  It is also

22  clear that Phoenix's massive investment losses cut deeply into the Company's

23  reserves, and, according to documents already produced in this action, Phoenix

24  raised the cost of insurance rates in 2010 specifically to induce "shock lapses" by

25  many of its policyholders.  These "shock lapses" would allow Phoenix to free up

26  and reallocate its reserves in order to be able to meet its near-term policy

27  obligations and, at the same time, remain solvent.   Plaintiff thus seeks discovery to

28  prove that Phoenix raised the cost of insurance rates for these and other improper

1   reasons, and to that end, Plaintiff has sought documents concerning Phoenix's

2   rating agency downgrades (RFP No. 73), potential insolvency (RFP No. 76), and

3   reserves (RFP Nos. 77 and 78).

4        Phoenix has refused to produce these documents unless, according to

5   Phoenix, they specifically "relate to" Phoenix's cost of insurance rate increases.

6   Thus, if Phoenix's management sent an email stating that the Company was in dire

7   financial straits, could not expect to generate sufficient revenue through the sales of

8   life insurance to stay in business, and needed to find alternative ways to generate

9   revenue and force policyholders to lapse their policies, Phoenix might not produce

10  this document because it did not specifically "relate to" Phoenix's rate increases.

11  And because Phoenix would simply withhold the document based on relevance,

12  Plaintiff would have no idea it ever existed.  There is simply no legal basis for

13  Phoenix to unilaterally narrow Plaintiff's document requests in this or any other

14  way.  The requests seek documents that are relevant to the claims in this case and,

15  at a minimum, are reasonably calculated to lead to the discovery of admissible

16  evidence, and the Court should order Phoenix to produce all documents responsive

17  to the requests as they are phrased.

18       Plaintiff also seeks an Order compelling Phoenix to provide a full and

19  complete response to Interrogatory No. 1.  Plaintiff served its First Set of

20  Interrogatories (the "Interrogatories") four months ago.  The Interrogatories

21  contained a mere **five** interrogatories.  Interrogatory No. 1 asked Phoenix to identify

22  the individuals who were involved in the design of the universal life insurance

23  policies at issue in this case.  It took Phoenix four months, and only after extensive

24  meet and confer efforts, to identify **six people** in response to this interrogatory.

25  Even now, Phoenix's response fails to answer the question asked, and simply lists

26  persons who "have knowledge regarding their respective department's involvement

27  in the design and development of the PAUL policies."  Because this incomplete

28  response prevents Plaintiff from being able to identify potential witnesses and

JOINT STIPULATION ISO PLAINTIFF'S MOTION TO COMPEL
CV11-09517 ODW (RZx)

1   custodians whose records should be searched for documents, the Court should order

2   Phoenix to provide a complete list of the individuals who were involved in the

3   design and development of the Phoenix policies at issue in this case.

4       Phoenix's deliberate obstruction and delay of discovery in this case has been

5   apparent from the start, because until this lawsuit is resolved, Plaintiff and many

6   other policyholders must continue to pay Phoenix's unlawful and excessive cost of

7   insurance charges just to keep their policies in force.  Thus, everyday this lawsuit is

8   pending, Phoenix gains and policyholders lose.  Plaintiff therefore respectfully

9   requests that the Court enter an order (a) requiring Phoenix to complete its

10  document production within 30 days; (b) requiring Phoenix to produce documents

11  responsive to RFP Nos. 73 and 76-78; (c) requiring Phoenix to supplement its

12  response to Interrogatory No. 1; and (d) requiring Phoenix to pay Plaintiff's

13  reasonable costs and attorneys' fees incurred in connection with bringing this

14  motion.

15      **B.     Defendant and Opposing Party's Introductory Statement**

16      Plaintiff's introductory statement above presents an incomplete, inaccurate,

17  and misleading version of the discovery story in this civil action.  Indeed, plaintiff's

18  concerns about the speed and extent of Phoenix's document productions not only

19  have been mooted by Phoenix's actual productions, but highlight the egregiousness

20  of plaintiff's own discovery conduct, which is the subject of a separate motion

21  being contemplated by PHL.

22      On July 11, 2012, plaintiff's counsel submitted to Phoenix's counsel

23  plaintiff's portion of this Joint Stipulation, initiating the procedure described in

24  Local Rule 37-2.  *See* Declaration of Jason H. Gould dated July 20, 2012 ("Gould

25  Decl."). ¶ 4.  Plaintiff's eagerness to present the discovery "issues" set forth herein

26  to the Court was surprising to Phoenix, given that plaintiff had already been assured

27  that Phoenix was close to finalizing a substantial document production. *Id.* ¶ 5.

28  Moreover, no case management order in this case has been entered, and no

1    discovery cut-off has been set.  *Id.* ¶ 15.

2         The next day, Phoenix's counsel again advised plaintiff's counsel that,

3    consistent with its prior assurances, Phoenix would make a document production

4    exceeding a half million pages no later than July 16, 2012, just four days later.  *Id.* ¶

5    6.  Accordingly, plaintiff was asked to defer acting on its motion to compel until

6    plaintiff first had an opportunity to review Phoenix's forthcoming document

7    production.  *Id.* ¶ 7.  Plaintiff declined to do so at that time.  *Id.*

8         As promised, on July 16, Phoenix produced to plaintiff a hard drive

9    containing *over 510,000 pages* of material responsive to plaintiff's document

10   requests.  *Id.* ¶ 8.  The hard drives also contained 480 files produced in native

11   format that, if imaged or printed, would constitute many thousands of additional

12   pages.  *Id.*  This is in addition to the more than 25,000 pages previously produced to

13   plaintiff, along with another 70 files in native format constituting thousands of

14   more pages.  *Id.* ¶ 9.[1]  As further noted below, in light of the materials produced to

15   date by Phoenix, plaintiff has represented to Phoenix that it is withdrawing (at least

16   for now) its argument in Part II, below, and its request for an order that Phoenix

17   complete all document production within 30 days.

18        Plaintiff has propounded 79 document requests and insisted on using

19   sweeping search terms.  The identification, collection, review, and processing of

20   documents in response to plaintiff's document requests has occurred at tremendous

21   burden and expense to Phoenix.  *Id.* ¶ 11.  And as set forth more fully below, the

22   documents already produced to plaintiff by Phoenix include most of the categories

23   plaintiff contends Phoenix refuses to provide, effectively mooting much of the

24   motion to compel, including Request Nos. 73 and 76 through 78.

25        Plaintiff would be better served by focusing on the gross deficiencies in its

26   own discovery responses than making hasty and unnecessary motions to compel.

27   ───────────────

28   [1] Phoenix estimates that, by the time it completes its productions, it will have
     supplied plaintiff documents far exceeding one million pages.  Gould Decl. ¶ 10.

Instead, plaintiff not only wastes the parties' and the Court's time requiring the briefing and resolution of phantom disputes concerning documents plaintiff already has or as to which a dispute is not ripe, but has the audacity to seek an order requiring Phoenix to pay the costs of this unnecessary briefing concerning non-issues Plaintiff has raised.[2]  As discussed below, to the extent costs are to be assessed, they should be assessed against plaintiff, not Phoenix, for plaintiff's dilatory conduct.  The Court should not tolerate plaintiff's improper actions, and should instead deny plaintiff's meritless, mooted motion to compel.

## II.   PHOENIX HAS FAILED TO PRODUCE DOCUMENTS IN A TIMELY MANNER

### A.   Plaintiff and Moving Party's Contentions

Plaintiff filed this action on November, 2011.  The parties held their Rule 26 Conference in late January, 2012 and agreed to a prompt schedule that provided for the close of fact discovery in October, 2012.  LeQuang Decl. ¶4.  Committed to maintaining the agreed nine-month fact discovery period, Plaintiff served the RFPs the day after the Rule 26 Conference.  *Id.* at ¶5.  After Plaintiff gave Phoenix an extension to respond to the RFPs, Phoenix served its responses on March 5, 2012.  *Id.* at ¶6.  Phoenix's first production of documents in this case did not occur for another six weeks, at which time Phoenix produced 604 pages of documents from a production Phoenix had already made months earlier in another case.  *Id.* at ¶7.  Two weeks later, Phoenix made another production consisting of 1,200 pages of regulatory statements that are publicly available on the Internet.  *Id.* at ¶8.  Two weeks later, Phoenix made its third and last production.  *Id.* ¶9.  Phoenix has not

---

[2] As will be discussed in Phoenix's forthcoming motion to compel, it is hypocrisy for plaintiff to complain about the speed and extent of Phoenix's productions when, despite Phoenix having served its document requests three months ago, plaintiff has failed to even provide the search terms it will use to search electronically stored information, let alone actually provide any electronic documents.   Gould Decl. ¶ 12.  To date, and in contrast to Phoenix's production of hundreds of thousands of pages to plaintiff, plaintiff has produced only *4,439 pages* of non-electronic documents, of which the vast majority are simply documents Phoenix previously provided to plaintiff.  *Id.* ¶ 13.

1   produced any documents since May 21, 2012. *Id.* at ¶10.  Moreover, Phoenix has

2   admitted that it has yet to produce a single document from its searches for ESI,

3   even though Phoenix agreed to perform these searches over two months ago. *Id.*,

4   Ex. O (June 22), Ex. I (May 2).

5       Furthermore, although Phoenix has produced an assortment of documents

6   reflecting **some** of its original and later pricing assumptions, these incomplete, self-

7   selected documents are meaningless without documents reflecting **all** of Phoenix's

8   original pricing assumptions, Phoenix's actual experience, and Phoenix's current

9   assumptions.  There are numerous highly relevant documents concerning Phoenix's

10  rate increases that Phoenix still has failed to produce, including all asset share

11  calculations prepared in connection with the original pricing of the policies, all

12  experience analyses, and all current assumptions.  Together, these documents will

13  show Phoenix's original assumptions on all of the cost of insurance factors,

14  Phoenix's actual experience with respect to these factors, and its current

15  assumptions for these factors.  These are basic documents that Phoenix had to

16  prepare, review, and rely on in deciding to raise its cost of insurance rates, and

17  Phoenix has no excuse for having not produced these documents six months into

18  discovery and two years after implementing its rate increases.

19      Plaintiff has repeatedly written to Phoenix about the speed of its production.

20  Id., Exs. B (April 10), J (May 9), N (June 20).  However, in light of Phoenix's

21  admission that, six months after receiving the RFPs, Phoenix has yet to produce a

22  single document from its electronic searches, it is apparent that Plaintiff's attempts

23  to obtain Phoenix's cooperation have been a waste of time, and the Court's

24  intervention is required.  Having committed to completing fact discovery in nine

25  months, it is inexcusable that Phoenix has yet to begin its production of ESI.

26  Plaintiff should not have to wait any longer for Phoenix to complete its production

27  of documents that Plaintiff requested six months ago. *See, e.g., Cochran v. City of*

28  *Huntington*, No. 1:05-CV-249, 2006 U.S. Dist. LEXIS 39516, at *9 (N.D. Ind. Mar.

31, 2006) (granting motion to compel where the responding party failed to complete production within four months).  Accordingly, the Court should order Phoenix to complete its production within 30 days.

## B.    Defendant and Opposing Party's Contentions

Given the magnitude of Phoenix's July 16 production, and the pendency of further substantial productions, plaintiff's request that the Court "order Phoenix to complete its production within 30 days" is moot.[3]  Plaintiff, apparently conceding as much, has represented to counsel for Phoenix that it is (for the time being) withdrawing the foregoing argument in Part II.A above and deferring its request that the Court "order Phoenix to complete its production within 30 days."  In light of that representation of counsel as well as the facial mootness of plaintiff's argument, Phoenix does not address further plaintiff's statements in Part II.A above.

## III.   PHOENIX REFUSES TO PRODUCE DOCUMENTS CONCERNING THE IMPROPER REASONS IT RAISED COST OF INSURANCE RATES ON ITS EXISTING POLICYHOLDERS

### A.    Discovery Requests and Responses at Issue:  73 and 76-78

Request for Production No. 73:

All documents that state, describe, constitute, comprise, evidence, reflect, or memorialize your strategy for responding to any rating agency downgrades since 2003.

Response to Request for Production No. 73:

PHL objects to Request for Production No. 73 because it is overbroad, unduly burdensome and seeks information beyond that relevant to Plaintiff's claims

---

[3] To be clear, and lest the Court infer that plaintiff's motion prompted Phoenix's recent production, plaintiff knew for some time – certainly before filing its motion to compel, *see, e.g.*, Gould Decl. ¶¶ 5 & 6; LeQuang Decl. Ex. O – that Phoenix's document production was forthcoming, would be substantial, and would eliminate or greatly diminish the need for judicial intervention.  This motion was therefore unnecessary to prompt the production.

1  or PHL's defenses.  PHL further objects to Request for Production No. 73 to the

2  extent it seeks the production of documents that are subject to attorney-client

3  privilege, work-product protection, or any other applicable privilege or protection.

4       Request for Production No. 76:

5       All COMMUNICATIONS, internal or with third parties (including but not

6  limited to state regulatory agencies and rating agencies) that concern YOUR

7  solvency or potential insolvency.

8       Response to Request for Production No. 76:

9       PHL objects to Request for Production No. 76 because it is overbroad,

10  unduly burdensome and seeks information beyond that relevant to Plaintiff's claims

11  or PHL's defenses.  PHL further objects to Request for Production No. 76 to the

12  extent it seeks the production of documents that are subject to attorney-client

13  privilege, work-product protection, or any other applicable privilege or protection.

14       Request for Production No. 77:

15       All DOCUMENTS that state, describe, constitute, comprise, evidence,

16  reflect, memorialize, or discuss the adequacy or inadequacy of YOUR reserves for

17  any group of policies that were subject to any change in cost of insurance rates.

18       Response to Request for Production No. 77:

19       PHL objects to Request for Production No. 77 to the extent it seeks

20  information relating to policies other than the POLICIES or the PAUL IIc and

21  PAUL III policies, because it is overbroad, unduly burdensome and seeks

22  information beyond that relevant to Plaintiff's claims or PHL's defenses.  PHL

23  further objects to Request for Production No. 77 to the extent it seeks the

24  production of documents that are subject to attorney-client privilege, work-product

25  protection, or any other applicable privilege or protection.  Subject to and without

26  waiving these objections and the General Objections and Objections to Instructions,

27  and contingent on the entry of a stipulated protective order governing the

28  production and exchange of confidential information in this Action, PHL will

JOINT STIPULATION ISO Plaintiff's Motion to Compel
CV11-09517 ODW (RZx)

1   produce responsive, non-privileged documents, if any, sufficient to show the

2   reserves established for PAUL IIc and PAUL III policies.

3          Request for Production No. 78:

4          All COMMUNICATIONS, internal or with third parties (including but not

5   limited to state regulatory agencies and rating agencies) that concern the adequacy

6   or inadequacy of YOUR reserves for any group of policies that were subject to any

7   change in cost of insurance rates.

8          Response to Request for Production No. 78:

9          PHL objects to Request for Production No. 78 to the extent it seeks

10   information relating to policies other than the POLICIES or the PAUL IIc and

11   PAUL III policies, because it is overbroad, unduly burdensome and seeks

12   information beyond that relevant to Plaintiff's claims or PHL's defenses.  PHL

13   further objects to Request for Production No. 78 to the extent it seeks the

14   production of documents that are subject to attorney-client privilege, work-product

15   protection, or any other applicable privilege or protection.  Subject to and without

16   waiving these objections and the General Objections and Objections to Instructions,

17   and contingent on the entry of a stipulated protective order governing the

18   production and exchange of confidential information in this Action, PHL states that

19   documents addressing the cost of insurance rates for PAUL IIc and PAUL III

20   policies that it provided to any state insurance regulatory authority or other

21   governmental entity will be produced in response to Request for Production No. 7,

22   and that documents, if any, sufficient to show the reserves established for PAUL IIc

23   and PAUL III policies will be produced in response to Request for Production

24   No. 77.

25          **1.     Plaintiff and Moving Party's Contentions**

26          Phoenix's objection that RFP Nos. 73 and 76-78 (the "Relevant Requests")

27   seek information that is neither relevant nor reasonably calculated to lead to the

28   discovery of admissible evidence is baseless.  These requests seek information

1    concerning the real reasons Phoenix raised the cost of insurance rates on its existing

2    policyholders, which is directly relevant to Plaintiff's claims in this case – namely,

3    that Phoenix raised cost of insurance rates for improper reasons.

4          In 2010, Phoenix began raising the cost of insurance rates on hundreds

5    (possibly thousands) of its existing policyholders.  In letters that Phoenix sent to

6    these policyholders, Phoenix stated that its rate increases were "in accordance with

7    the terms" of their policies.  Phoenix, however, did not provide any factual basis for

8    the rate increases, nor did Phoenix identify the policy provisions on which it was

9    relying to raise the cost of insurance rates.  LeQuang Decl., Ex. P.  Although

10   Plaintiff's Policies permit Phoenix to change (by an increase or a decrease) the cost

11   of insurance rates based on certain factors identified in the Policies, these factors do

12   not, on their face, support an increase in rates.[4]

13         For example, the primary factor in setting the cost of insurance rates is the

14   risk of loss, which for life insurance is the risk of death, or "mortality."  It is well-

15   known in the life insurance industry that since Phoenix issued Plaintiff's policies

16   several years ago, mortality has **improved**, not worsened, which would warrant a

17   **decrease**, not increase, in Plaintiff's cost of insurance rates.  In fact, in Phoenix's

18   quarterly earnings call for the first quarter of 2010 – just before Phoenix announced

19   its first rate increase, Phoenix's Chief Financial Officer, Peter Hofmann, reported,

20   "Benefits are lower largely because of **favorable mortality**," and that "open block

21   **experience this quarter was favorable**, particularly as measured against the four

22   quarter moving average."  LeQuang Decl., Ex. S (Transcript of Earnings

23   Conference Call dated May 4, 2010 (pages 3 and 4 of 13) (emphasis added)).  In the

24   previous quarter, Hofmann reported, "[universal life] mortality in 2009 was **below**

25   **long-term expectations**," and "overall mortality was **in-line with expectations**."

26   *Id.*, Ex. R (Transcript of Earnings Conference Call dated February 11, 2010 (page 5

27

28

---

[4] The factors identified in the Policies are Phoenix's expectations of mortality, investment earnings, persistency, capital and reserve requirements, expenses, and tax assumptions.  First Amended Complaint ("Complaint") ¶17, Exs. 2, 3 [D.E. 42].

JOINT STIPULATION ISO PLAINTIFF'S MOTION TO COMPEL
CV11-09517 ODW (RZx)

1  of 11) (emphasis added)).  These reports came after Chief Executive Officer, Jim

2  Wehr, reported, with respect to unfavorable mortality results in the second quarter

3  of 2009, "[W]e do not believe the mortality this quarter signals any underlying

4  issue with the quality of our UL business.  **I should remind you that in the four**

5  **previous quarters, we had favorable mortality experience**."  *Id.*, Ex. Q

6  (Transcript of Earnings Conference Call dated August 4, 2009 (page 3 of 16)

7  (emphasis added)).   Thus, Plaintiff has sought discovery that will show that

8  mortality and the other the cost of insurance factors stated in the Policies do not

9  support Phoenix's rate increases.

10        In addition, however, Plaintiff has sought discovery, including the Relevant

11  Requests, about the **real** reasons Phoenix began raising cost of insurance rates in

12  2010.  While Phoenix's rate increases cannot be explained by changes in mortality

13  (or any of the other factors stated in the Policies), the timing of Phoenix's rate

14  increases was by no means arbitrary or coincidental.  Between 2008 and early 2009,

15  Phoenix suffered a major collapse as a result of the national financial crisis, which

16  entailed a number of significant events, including the following:

17  •  In 2008, **Phoenix reported hundreds of millions of dollars in losses**

18     **on investment holdings** that, according to insurance rating agencies,

19     consisted of "higher than industry average exposure to commercial

20     mortgage-backed securities, Alt-A residential mortgage-backed

21     securities and below investment grade bonds as a result of its

22     investment strategy."  LeQuang Decl., Ex. T (A.M. Best Report dated

23     July 14, 2009) at 1.

24  •  In 2009, **insurance rating agencies downgraded Phoenix's ratings**

25     **and their future outlook for the Company**.  A.M. Best (mentioned

26     above) cited Phoenix's "below average operating returns, recently

27     declining life and annuity sales, and a diminished business profile

28

1  following the loss of two of its most significant distribution
2  relationships." *Id.* at 1.

3  •  A.M. Best went on to comment that "Phoenix will be **challenged to**
4  **grow statutory life and annuity premium** following the
5  announcement that its top two distributors – State Farm and National
6  Life Group – have suspended sales of Phoenix's life and annuity
7  products." *Id.* (emphasis added).

8  •  Between September 19, 2008 and March 6, 2009, **Phoenix's stock**
9  **price (NYSE:PNX) plummeted from $13.95 per share to $0.29 per**
10  **share.** *See* http://www.google.com/finance?q=NYSE:PNX (last
11  visited July 11, 2012).

12  •  At the close of 2008, **Phoenix reported a loss of over $1 billion in**
13  **shareholder equity** – from $2.279 billion in 2007 to $865 million in
14  2008. *See* LeQuang Decl., Ex. U (The Phoenix Companies, Inc. 2008
15  Form 10-K, Consolidated Balance Sheet, at F-1 (March 31, 2009)).

16  Precisely one year after these and similar developments occurred, Phoenix
17  implemented what the Company has secretly referred to as "Project X," pursuant to
18  which Phoenix began raising the cost of insurance rates on Plaintiff's and other
19  policyholders' policies.[5]

20  a.  **The Relevant Requests Seek Relevant Information**
21  **About the Real, Impermissible Reasons Phoenix**
22  **Raised Cost of Insurance Rates.**

23  The Relevant Requests seek information that is directly relevant to Plaintiff's
24  claim in this case – namely, that Phoenix raised Plaintiff's cost of insurance rates
25  for impermissible reasons. A party is entitled to discovery "regarding **any**

26

27  [5] Phoenix began devising Project X sometime in 2008, which coincidentally is when Phoenix
began experiencing serious financial problems as a result of the economic crisis. LeQuang Decl.,
28  Ex. V. Even internally, Project X was considered highly confidential and was only to be
disclosed to persons on a "need to know basis." *Id.*

nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. Proc. Rule 26(b)(1) (emphasis added). "Relevant information need not be admissible at the trial if the discovery **appears reasonably calculated to lead to the discovery of admissible evidence**." *Id.* (emphasis added). Courts have interpreted this expansive definition of relevance broadly to encompass "any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Davis v. Circuit City Stores, Inc.*, 06-04804 (DDP)(PJWx), 2010 U.S. Dist. LEXIS 37464, at *11 (C.D. Cal. Apr. 14, 2010) (internal quotation and citation omitted).

Here, although Phoenix has claimed that the primary drivers for its rate increases were changes in its expectations of future mortality, persistency, and investment earnings, these claims are highly suspect in light of the circumstances surrounding Phoenix's rate increases. Thus, the Relevant Requests seek documents that will show, contrary to what Phoenix claims, that Phoenix raised cost of insurance rates for a number of other, improper reasons arising out of events in 2008 and 2009, including concerns about Phoenix's solvency (RFP No. 76) and the adequacy of its reserves to pay future claims (RFP Nos. 77 and 78), as well as its inability to remedy these issues due to its limited ability to sell new life insurance as a result of credit rating downgrades (RFP No. 73).

For example, RFP No. 76 seeks documents concerning Phoenix's solvency or potential insolvency, which will show that the Company teetered on the edge of insolvency, as its stock price fell to $0.29 per share on March 6, 2009 and shareholder equity dropped by nearly $1.5 billion during 2008. As a result of this potential insolvency, Phoenix improperly raised cost of insurance rates to try to recoup some of the massive investment losses resulting from its reckless investments in subprime and residential mortgage-backed and asset-backed securities and below investment grade bonds, in breach of the express terms of the Policies, which prohibit Phoenix from raising cost of insurance rates to "recoup

1    prior losses."

2         Likewise, RFP Nos. 77 and 78 seek documents concerning the adequacy of

3    Phoenix's reserves to pay future claims.  These documents will show that Phoenix

4    improperly raised cost of insurance rates to generate additional revenue to make up

5    for the inadequate reserves resulting from the losses in the Company's investment

6    portfolio, also in breach of the prohibition against raising cost of insurance rates to

7    "recoup prior losses."  These documents will also show that Phoenix specifically

8    intended to force policyholders to lapse their policies so that Phoenix could free up

9    and reallocate the reserves associated with their policies.  Indeed, Phoenix's

10   internal documents show that Phoenix specifically intended for its cost of insurance

11   rate increases to induce "shock lapses" by policyholders.  LeQuang Decl., Ex. W

12   (PHL025239) ("The 2009 assumption for ART funded cases implicitly included

13   some anticipated natural lapses as well **as some shock lapses due to the COI**

14   **increase**.") (emphasis added).  By trying to induce "shock lapses" by policyholders,

15   Phoenix deliberately tried to prevent policyholders from obtaining the benefits of

16   their policies in breach of the implied covenant of good faith and fair dealing.  *See,*

17   *e.g., Schwartz v. State Farm Fire & Cas. Co.*, 88 Cal. App. 4th 1329, 1336 (2001)

18   (an insurer's duty of good faith "is implied as a supplement to [] express contractual

19   covenants, to prevent a contracting party from engaging in conduct that **frustrates**

20   **the other party's rights to the benefits of the agreement**") (emphasis added).

21        RFP No. 73 seeks documents concerning Phoenix's strategy for addressing

22   credit rating agency downgrades.  These documents are especially relevant because

23   they will show that as a result of these downgrades, Phoenix knew it would not be

24   able to generate revenue the way a legitimate life insurance company does – by

25   selling more life insurance.  Thus, documents responsive to RFP No. 73 will show

26   that Phoenix made a calculated decision to look to its existing policyholders as a

27   source of revenue to replace the Company's lost sales resulting from its own

28   mismanagement.  Not only would this be an improper attempt to recoup prior

1   losses, but by using its existing policyholders to replace lost sales, Phoenix abused

2   its discretion to change cost of insurance rates, in breach of the implied covenant of

3   good faith and fair dealing.  *See, e.g., Schwartz*, 88 Cal. App. 4th at 1336.  ("[T]o

4   fulfill its obligation not to impair the right of the insured to receive the benefits of

5   the agreement, [the insurer] 'must give at least as much consideration to the

6   [insured's] interests as it does to its own.'") (quoting *Egan v. Mutual of Omaha Ins.*

7   *Co.*, 24 Cal. 3d 809, 818-19 (1979)).

8          Together, the Relevant Requests seek documents that will show that Phoenix

9   raised cost of insurance rates on existing policyholders as part of a broader strategy

10  to (a) replace lost revenue following rating agency downgrades and (b) force

11  "shock lapses" to free up and reallocate reserves to address the Company's

12  solvency and reserve issues.   Such requests clearly fall within the broad scope of

13  relevant discovery under the Federal Rules of Civil Procedure.

14         Moreover, claims for breach of the implied covenant of good faith and fair

15  dealing "against insurance companies necessarily have a subjective intent

16  component that can be difficult to prove," and a plaintiff should be given wide

17  latitude in obtaining discovery about an insurer's motives and state of mind.

18  *Oneok, Inc. v. Nat'l Union Fire Ins. Co.*, 06-CV-200GKFSAJ, 2007 WL 2891519,

19  at *1 (N.D. Okla. Sept. 28, 2007); *see also Insurance Co. of State of Pa. v. City of*

20  *San Diego*, 02CV693BEN(CAB), 2008 WL 926560, at *1 (S.D. Cal. Apr. 4, 2008)

21  (ordering production of documents that were relevant to insurer's state of mind

22  concerning potential for coverage).  Accordingly, Plaintiff should be entitled to

23  discovery that will show or tend to show that Phoenix's asserted bases for raising

24  cost of insurance rates were pretextual, and further, that in providing such

25  disingenuous reasons, Phoenix breached the implied covenant of good faith and fair

26  dealing.  *See, e.g., Neal v. Farmers Ins. Exch.*, 21 Cal. 3d 910, 921 (1978)

27  (upholding jury award against insurer for breach of the implied covenant of good

28  faith and fair dealing after considering evidence of insurer's motives and conduct);

1    *see also, e.g., Kirschenman v. Auto-Owners Ins.*, 280 F.R.D. 474, 483-85 (D.S.D.

2    2012) (ordering insurer to produce documents concerning insurer's cost

3    containment, profitability, and loss ratios because such documents were relevant to

4    plaintiffs' claim that insurer denied benefits in order to cut costs); *First Tennessee*

5    *Bank Nat. Ass'n v. Republic Mortg. Ins. Co.*, 276 F.R.D. 215, 222 (W.D. Tenn.

6    2011) (granting motion to compel production of documents reflecting insurer's

7    motives, thoughts, and knowledge).

8         This case is very similar to *First Tennessee Bank*.  In *First Tennessee Bank*,

9    the bank filed an action against its insurer asserting that the insurer breached the

10   policy and the duty of good faith and fair dealing by rescinding coverage under a

11   "flow mortgage" insurance policy, which insured the bank against defaults on

12   mortgage loans.  The bank moved to compel responses to certain interrogatories

13   and document requests, and the court held, among many other things, that

14   information concerning the insurer's financial condition during the economic

15   downturn was relevant to the insurer's motive in refusing to pay the bank's claims:

16        First Tennessee argues that documents evidencing RMIC's financial

17   condition before, during, and after the financial meltdown may explain the reasons

18   for RMIC's change in practices towards First Tennessee and its motivations for

19   increasing rescissions.  First Tennessee argues that this discovery is relevant to its

20   claims of bad faith.  RMIC argues that a cause of action for bad faith under Texas

21   law has nothing to do with the purported motivation of the insurer, but instead only

22   whether the insurer knew or should have known that it lacked a reasonable basis for

23   denying a claim . . . .  However, as the District Court has already concluded,

24   Texas's cause of action for bad faith is premised upon the principle that "an insurer

25   may not favor its own interests over those of an insured." . . .  First Tennessee's

26   Complaint and theory of the case alleges precisely that RMIC faced financial

27   hardship and improperly denied coverage to avoid further financial harm, regardless

28   of the consequences to its insured. Accordingly, the Court will compel RMIC to

JOINT STIPULATION ISO PLAINTIFF'S MOTION TO COMPEL
                                     CV11-09517 ODW (RZx)

1   respond to Request for Production 41.

2          276 F.R.D. 215, 223-24 (internal citations omitted).  Here, similar to *First*

3   *Tennessee Bank*, Phoenix's financial condition is relevant to, among other things,

4   Phoenix's wrongful reasons for raising cost of insurance rates on its existing

5   policyholders, including Plaintiff.[6]

6          In addition to the foregoing, the Relevant Requests seek information that is

7   relevant to punitive damages based on Phoenix's violations of the Connecticut

8   Unfair Insurance Practices Act ("CUIPA") and Connecticut Unfair Trade Practices

9   Act ("CUTPA").  Punitive damages are available under CUIPA or CUTPA where

10  the defendant acted with a "reckless indifference to the rights of others or an

11  intentional and wanton violation of those rights." *Votto v. Am. Car Rental, Inc.*, 273

12  Conn. 478, 486 (2005) (quoting *Gargano v. Heyman,* 203 Conn. 616, 622 (1987));

13  *United Technologies Corp. v. Am. Home Assur. Co.*, 118 F. Supp. 2d 174, 176 (D.

14  Conn. 2000).  A reasonable juror could easily conclude that by raising cost of

15  insurance rates on its existing policyholders in order to make up for revenue lost as

16  a result of the Company's gross mismanagement and reckless investment decisions,

17  particularly in light of the representations the Company had made about the terms

18  of its policies and its cost of insurance rates, Phoenix acted willfully and with

19  reckless indifference to Plaintiff's rights.

20         Accordingly, Plaintiff is entitled to discovery concerning the real reasons

21  Phoenix raised cost of insurance rates, including documents concerning Phoenix's

22  potential insolvency, the inadequacy of its reserves, and its strategy for responding

23  to credit rating agency downgrades.

24                        **b.     Plaintiff Has Met and Conferred With Phoenix**

25         Plaintiff has attempted to meet and confer with Phoenix about the Relevant

26  Requests over the past several months.  Phoenix originally refused to produce **any**

27  _____

    [6] Also, just as in *First Tennessee Bank*, California law recognizes that an insurer's duty of good
28  faith and fair dealing requires it to give at least as much consideration to the insured's interest as
    its own. *See, e.g., Schwartz*, 88 Cal. App. 4th at 1336.

                                    - 18 -

1    documents in response to the Relevant Requests based on objections of overbreadth

2    and privilege.  During the meet and confer process, however, Plaintiff explained the

3    relevance of the information these requests sought.  LeQuang Decl., Exs. A, B

4    (March 15, April 10 letters.).  Phoenix then took the position that it would not

5    produce any documents in response to these requests, unless those same documents

6    were being produced in response to other requests.  *Id.*, Exs. D, G (April 11, April

7    17 letters).  Plaintiff then explained that Phoenix's position was untenable.  *Id.*, Ex.

8    K (May 16 letter).  By agreeing to produce **some** documents responsive to the

9    Relevant Requests, Phoenix acknowledged that the Relevant Requests sought

10   relevant information; therefore, Phoenix had no right to limit its production only to

11   documents that were being produced in response to other requests.  *Id.*

12        Phoenix then proposed to produce only documents that, according to

13   Phoenix, "relate to" Phoenix's evaluation of its cost of insurance rates or the

14   ultimate rate adjustment decision.  *Id.*, Exs. M, O (June 5, 22 letter).  This proposal,

15   however, was still inadequate, because Phoenix might still withhold a variety of

16   potentially relevant documents without Plaintiff ever knowing it.  *Id.*, Ex. N (June

17   20).  For example, Phoenix might withhold documents discussing Phoenix's

18   broader strategy to replace lost revenue from its inability sell new life insurance as

19   a result of credit rating agency downgrades and concerns about its solvency and

20   ability to pay future claims on the ground that these documents did not "relate to"

21   the evaluation or ultimate decision to raise rates.  Because the Relevant Requests

22   seek documents that are directly relevant to Plaintiff's claims (and certainly are

23   reasonably calculated to lead to the discovery of admissible evidence), Phoenix has

24   no right to unilaterally narrow these requests.

25        Furthermore, Phoenix has suggested that the Relevant Requests are unduly

26   burdensome.  The Court should reject this objection out of hand.  A "party claiming

27   that a discovery request is unduly burdensome must allege specific facts which

28   indicate the nature and extent of the burden, usually by affidavit or other reliable

1   evidence." *Jackson v. Montgomery Ward & Co., Inc.*, 173 F.R.D. 524, 528-29 (D.

2   Nev. 1997). Phoenix has never provided any evidence to support its burden

3   objections, nor could it.

4             **2.    Defendant and Opposing Party's Contentions**

5          The scope of plaintiff's Request Nos. 73 and 76 through 78 is breathtaking.

6   In sum, plaintiff seeks the production of *all* documents relating to Phoenix's

7   solvency, reserves, or rating agency grading – unlimited by custodian, time period,

8   or product line, and without being able to identify any documents or discovery

9   creating any connection between those issues and the issues and claims in the

10  Amended Complaint.  For an insurance company like Phoenix – which lives and

11  dies by the careful and continuous monitoring and documentation of its ratings and

12  reserves – such requests would require the identification and production of

13  mountains of mundane and obscure documents that, while technically "responsive"

14  to the requests, have nothing to do, even remotely, with the claims or defenses in

15  this case.  *See Nugget Hydroelectric, L.P. v. Pac. Gas & Elec. Co.*, 981 F.2d 429,

16  438-39 (9th Cir. 1992) (affirming denial of plaintiff's document requests as

17  demanding "millions of pages of documents concerning every aspect of PG&E's

18  relationships with private power suppliers, only a fraction of which could be

19  deemed relevant to the subject matter of [plaintiff's] fraud claim").  The irrelevance

20  of *all* documents holds whether or not Phoenix's reasons for adjusting cost of

21  insurance rates on certain variants of its PAUL product series were "actual" or, as

22  plaintiff speculates above, "pretextual."[7]  "District courts need not condone the use

23  

24  [7] It is worth observing that the claim that Phoenix adjusted the cost of insurance rates based on lost profits, rather than the factors permitted in the subject policies, is

25  belied by the very documents plaintiff attaches in support of its motion to compel. *See, e.g.*, LeQuang Decl. Ex. V (internal email between Phoenix employees

26  summarizing the factors to include in the analysis for a potential increase:  "In summary, the approach is that on a monthly basis, a threshold table, which has age,

27  duration and mortality, will be used to look up a value.  This value will be compared to the result of the account value to death benefit ratio calculation.  The

28  result of that will determine which COI table or factor to use to derive the new COI rate for that policy.").

                                    - 20 -        JOINT STIPULATION ISO PLAINTIFF'S MOTION TO COMPEL
                                                              CV11-09517 ODW (RZx)

1   of discovery to engage in 'fishing expeditions." *Rivera v. Nibco, Inc.*, 364 F.3d

2   1057, 1072 (9th Cir. 2004).

3       Phoenix has therefore made a modest effort to cabin these sweeping requests.

4   In response to Request Nos. 73 and 76 through 78, Phoenix has agreed in writing to

5   produce documents concerning any purported strategy for responding to agency

6   downgrades, to the extent such documents relate *in any way* to Phoenix's

7   evaluation of cost of insurance rates and the ultimate rate adjustment decision. *See*

8   LeQuang Decl. Ex. O. Phoenix also has agreed in writing to produce documents

9   concerning its solvency and the extent of its reserves, to the extent such documents

10  bear upon Phoenix's reasons for adjusting the rates. *Id.* More than this, Phoenix

11  has searched its files and will be producing documents relevant to Phoenix's

12  solvency, reserves, or rating agency grading to the extent they have a bearing upon

13  the PAUL product series at issue, whether or not related to the rate adjustments.

14      Against this backdrop, Phoenix cannot discern what more it can reasonably

15  produce in this action challenging its cost of insurance rate adjustments. Is plaintiff

16  truly insisting upon the collection, review, and production of documents concerning

17  purported strategies for responding to agency downgrades that did *not* relate in any

18  way to Phoenix's evaluation of cost of insurance rates and ultimate rate adjustment

19  decision? Likewise, must Phoenix produce documents concerning its solvency and

20  the extent of its reserves that did *not* bear upon Phoenix's reasons for adjusting the

21  rates? Plaintiff speculates above, quite ominously, that without judicial

22  intervention "Phoenix might still withhold a variety of potentially relevant

23  documents without Plaintiff ever knowing it." But the same could be said to indict

24  the entire federal civil discovery process, which depends upon one side identifying

25  and producing the non-privileged documents it believes, in good faith, to be

26  responsive and relevant to the opposing side's discovery requests. That is precisely

27  what Phoenix has agreed to do, and what Phoenix should be permitted to continue

28  to do with respect to Request Nos. 73 and 76 through 78. The continued insistence

Joint Stipulation ISO Plaintiff's Motion to Compel
CV11-09517 ODW (RZx)

1    upon limitless production amounts to harassment.

2         Plaintiff's complaints in this regard also are premature.  Phoenix has

3    expanded its searches and generally captured documents relating to these issues

4    regardless of whether the documents explicitly refer to "cost of insurance."  *Id.*

5    Those searches, and the review and processing of the captured documents, are

6    ongoing.  It is improper for plaintiff to demand judicial intervention without first

7    allowing Phoenix to complete its discovery efforts, and without even taking the

8    opportunity to review Phoenix's July 16 production.  Many documents falling

9    within the categories at issue are contained within that massive collection of

10   documents.  Plaintiff simply decided not to look for them before asking for the

11   Court's intervention in this motion.

12        Phoenix has informed plaintiff during the parties' discovery conferences that

13   if it finds a single "door opener" in any of the documents produced indicating a

14   connection between solvency, reserves, and or rating agency considerations and the

15   rate adjustment decisions, Phoenix would reconsider a more expansive review for

16   such documents.  Plaintiffs, however, have identified no such nexus and seek to

17   impose this burden on Phoenix in the absence of any connection between these

18   issues and the subject matter of this litigation.

19   **IV.   PHOENIX HAS FAILED TO PROVIDE A COMPLETE RESPONSE**

20   **       TO INTERROGATORY NO. 1**

21        **A.    Discovery Requests and Responses at Issue:  1**

22        INTERROGATORY NO. 1:

23        Identify all persons, including any current and former PHL employees, who

24   were involved in the design and development of the PAUL policies by providing

25   each such person's name, title(s), role in the design or development, and last known

26   address and telephone number.

27        RESPONSE TO INTERROGATORY NO. 1:

28        PHL objects to this interrogatory as overbroad and burdensome, and not

1   seeking information relevant to the claim or defense of any party.  Among other

2   things, the lawsuit does not challenge or otherwise relate to "the design or

3   development of the PAUL policies," but instead challenges PHL's alleged conduct

4   in raising cost of insurance rates for certain PAUL product series — PAUL IIc and

5   III.  PHL further objects to this interrogatory as seeking "all" persons who had a

6   "role in the design or development" of the PAUL policies, rendering the

7   interrogatory so broad and vague as to not be susceptible of reasoned interpretation.

8   And PHL further objects that the specific nature of each such person's participation

9   or role in connection with the conduct alleged in the Complaint can be obtained in a

10  more convenient, less burdensome, or less expensive manner by review of

11  documents to be produced.  PHL also objects to this interrogatory as premature.

12  Discovery is at an early stage and PHL is continuing its investigation.

13          SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:

14          Subject to and without waiving its objections, PHL states that Byron Frank

15  and Stewart Kwassman were the product design leads for the design and

16  development of the PAUL product series (PAUL I, PAUL II, PAUL III).  PHL

17  further states that it does not maintain a comprehensive listing of other persons'

18  participation or role in connection with the design and development of the PAUL

19  product series and that developing such information would be unduly burdensome,

20  bur that the involvement of other persons in design and development of the PAUL

21  policies will be reflected in the documents to be produced in response to plaintiff's

22  Requests for Production of Documents.

23          FURTHER SUPPLEMENTAL RESPONSE TO INTERROGATORY

24  NO. 1:

25          Subject to and without waiving its objections, PHL states that, upon a

26  reasonable investigation, it has determined that the following individuals have

27  knowledge regarding their respective departments' involvement in the design and

28  development of the PAUL policies:

1    Information Technology:  Deborah Culliton

2    Operations:  Kathy Genier

3    Product Development:  Stuart Kwassman, Byron Frank

4    Legal:  Joseph DeCresce

5    Marketing:  Christopher Kelly

6        **1.      Plaintiff and Moving Party's Contentions**

7        This interrogatory seeks very basic information.  Plaintiff simply wants to

8    know who was involved in the design and development of the PAUL policies at

9    issue in this case.  Unfortunately, it was apparent from the beginning that Phoenix

10   was not interested in responding in good faith to Plaintiff's five simple

11   interrogatories, including this one.  In its original responses to the Interrogatories,

12   Phoenix served objections to all five interrogatories, save one reference to

13   Phoenix's initial disclosures, and stated, "Discovery is at an early stage and PHL is

14   continuing its investigation."  LeQuang Decl., ¶12.  After four months and two

15   supplemental responses, Phoenix's latest response to Interrogatory No. 1, which

16   identifies six individuals who "have knowledge regarding their respective

17   department's involvement in the design and development of the PAUL policies," is

18   still grossly inadequate.

19       Phoenix refused to fully answer Interrogatory No. 1 because Phoenix claims

20   it "does not maintain a comprehensive listing of other persons' participation or

21   role."  However, this is no basis for failing to provide the requested information.

22   Phoenix has a duty to provide "the information available to [it]."  Fed. R. Civ. Proc.

23   33(b)(1)(B).  The fact that Phoenix does not maintain a "comprehensive listing" of

24   individuals does not mean that the information is not available to Phoenix.  Phoenix

25   is required to make a reasonable inquiry of its employees and available documents

26   to obtain the information.  *See, e.g., Sevey v. Soliz*, 2011 U.S. Dist. LEXIS 71620,

27   at *11-13 (N.D. Cal. July 2, 2012) (explaining that the "answering party is required

28   to give the information available to him, if any, through his attorney, investigators

- 24 -                           JOINT STIPULATION ISO Plaintiff's Motion to Compel
                                          CV11-09517 ODW (RZx)

1    employed by him or on his behalf, or other agents or representatives, whether
2    personally known to the answering party or not."); *Evans v. Tilton*, 2010 U.S. Dist.
3    LEXIS 47328, at *4-5 (E.D. Cal. Apr. 20, 2010) ("When answering interrogatories,
4    parties have an affirmative duty to furnish any and all information available to the
5    party.") (citation omitted).  Here, Phoenix clearly has information in its possession
6    regarding the persons who were involved in the design and development of the
7    PAUL policies.  For example, Phoenix could easily ask each of the six persons now
8    identified as having knowledge to provide the names of anyone else who was
9    involved in the design and development of the PAUL policies.  Phoenix could then
10   provide Plaintiff with that complete list.  Instead, Phoenix simply shirked its
11   discovery obligations by refusing to make such a simple inquiry.

12        It is patently obvious that Phoenix is trying to obstruct Plaintiff from
13   identifying potential witnesses and document custodians who might have relevant
14   information, as Phoenix's relevance and undue burden objections are completely
15   spurious.  The design and development of the PAUL policies go to the very heart of
16   Plaintiff's claim that Phoenix improperly raised cost of insurance rates, in particular
17   by basing its rate increases on a policy's accumulated value.  Complaint ¶23.
18   Plaintiff has specifically alleged that these rate increases contradicted the very
19   purpose and design of the policies, which was to give policyholders flexibility in
20   the amount of premiums they paid and when they could pay them. *Id.* ¶27.  Indeed,
21   Plaintiff has also alleged that Phoenix has made numerous false and misleading
22   statements about these design features in its press releases, illustrations, and the
23   Policies themselves, *id.* ¶¶19-20, 28, and it goes without saying that anyone
24   involved in developing these design features is likely to have knowledge that is
25   relevant to the claims in this case.

26        Furthermore, Phoenix's assumptions in setting the cost of insurance rates are
27   significant components of the policies' design.  To evaluate the propriety of
28   Phoenix's decision to raise cost of insurance rates, Plaintiff must understand how

JOINT STIPULATION ISO PLAINTIFF'S MOTION TO COMPEL
CV11-09517 ODW (RZx)

1   the policies were initially designed, including Phoenix's assumptions about

2   mortality, persistency, investment earnings, and other policy factors.  The

3   individuals involved with this design have direct knowledge of these issues.

4   Among many other things, policy design also includes the choice of policy

5   language.  Given that this case revolves largely around the interpretation of the

6   Policies, the individuals who were involved in this aspect of the design of the

7   Policies will clearly have knowledge that is relevant to Plaintiff's claims.

8        Moreover, Phoenix's objection that identifying its own current and former

9   employees would be unduly burdensome is as frivolous as its relevance objection.

10  Phoenix knows who designed and developed the PAUL policies, and Phoenix can

11  obtain that information through a reasonable inquiry of the individuals involved.  In

12  fact, Phoenix has already identified the individuals in the various departments who

13  "have knowledge regarding their respective department's involvement in the design

14  and development of the PAUL policies."  To answer this interrogatory fully, all

15  Phoenix needs to do is ask these individuals who else was involved in the design

16  and development process.  If, however, Phoenix insists that responding to this

17  interrogatory will pose an undue burden, then Phoenix must describe in detail the

18  burden it presents.  *See Jackson*, 173 F.R.D. at 528-29.

19              **2.    Defendant and Opposing Party's Contentions**

20       Plaintiff claims above that it "simply wants to know who was involved in the

21  design and development of the PAUL policies at issue in this case."  At one level,

22  the answer to that question is simple: Deborah Culliton, Kathy Genier, Stuart

23  Kwassman, Byron Frank, Joseph DeCresce, and Christopher Kelly are the key

24  managerial employees with a role in the PAUL policies' design and development,

25  and who have knowledge regarding their respective departments' involvement in

26  the policies' design and development.

27       At another level, however, the answer is exceedingly difficult because

28  plaintiff insists on a comprehensive listing "of anyone else who was involved in the

JOINT STIPULATION ISO PLAINTIFF'S MOTION TO COMPEL
CV11-09517 ODW (RZx)

1    design and development of the PAUL policies."  Interrogatory No. 1 requires the

2    determination of every person who did any work in any way related to the policies'

3    design and development.  Many employees at all different levels of the company,

4    however, contributed to work that went into the policies' design and development.

5    Employees and consultants may have floated in and out of the product design and

6    development project, or may have had limited, even tangential, roles in discrete

7    aspects of the PAUL policies' creation and evolution on a near continuous basis for

8    the last decade on multiple generations of PAUL policies.  Based on plaintiff's

9    reading, Phoenix would need to ascertain every person asked to do something by

10   the key persons involved, all of whom have already been disclosed by Phoenix.  At

11   a basic level, that is an unreasonable request as it requires the determination of

12   every person who did any work in any way related to the design and development

13   of the PAUL policies.  Phoenix has done exactly what plaintiff requested – it has

14   made a reasonable investigation and identified the key persons who were involved

15   in the design and development of PAUL.

16   In addition, Phoenix does not maintain such a listing of other persons'

17   participation or role in connection with the design and development of the PAUL

18   product series.  Further complicating matters is that Phoenix began designing and

19   developing the PAUL policies more than a decade ago.  Institutional memory of

20   "all persons" involved in the policies' design and development has faded.  Worse

21   still, plaintiff seeks the identity of all persons involved, regardless of whether those

22   persons have any relevant knowledge or information specific to this action.  But

23   this case has little to do with the policies' initial "design or development" in a broad

24   sense.  More specifically, the pricing of the policies' COI rates, initially, and re-

25   pricing at the time of the rate increases, is at the heart of plaintiff's claims, and

26   full discovery of that topic is not in dispute.

27   Accordingly, plaintiff's Interrogatory No. 1 is facially overbroad and seeks

28   irrelevant information.  Indeed, courts faced with interrogatories worded strikingly

1   similarly to Interrogatory No. 1 have held that such interrogatories "are overbroad

2   on their face," and have limited answers to the responding party's key managerial

3   employees. *See, e.g.*, *Regan-Touhy v. Walgreen Co.*, 526 F.3d 641, 648 (10th Cir.

4   2008) (interrogatory asking defendant "to identify every person involved in the

5   design and maintenance" of its computer system was "overly broad"); *Koninklijke*

6   *Philips Electronics N.V. v. KXD Technology, Inc.*, No. CV 05-1532, 2007 WL

7   778153, at *7 (D. Nev. Mar. 12, 2007) ("Interrogatory 14 asks for the identity of all

8   persons who participated or are participating in any manner in the design,

9   manufacture, advertising, creation, production, importation, packaging, distribution,

10  sale or offer for sale of each of the ACCUSED PRODUCTS.  These interrogatories

11  are overbroad on their face.  The Court will, therefore, limit the Defendants'

12  answers to these interrogatories to Defendants' officers, directors, key employees;

13  *i.e.*, managerial employees or department head employees.").  The Court should do

14  the same here.

15       In any event, Phoenix is producing to plaintiff documentation regarding the

16  PAUL policies' design and development, as well as the company's organization

17  charts.  Plaintiff can identify from those documents the names of persons involved

18  in the policies' design and development just as readily as might Phoenix.  Phoenix

19  should not be put to the burden of doing plaintiff's discovery work for it.

20  **V.      THE COURT SHOULD ORDER PHOENIX TO REIMBURSE**

21          **PLAINTIFF'S EXPENSES IN BRINGING THIS MOTION**

22          **A.     Plaintiff and Moving Party's Contentions**

23       Phoenix should not be allowed to gain a tactical advantage by failing to

24  follow the proper course and conduct of discovery.  "[I]f a failure to comply has

25  occurred, it becomes encumbent [sic] upon the disobedient party to show that his

26  failure is justified or that special circumstances would make an award of expenses

27  unjust." *David v. Hooker*, 560 F.2d 412, 419 (9th Cir. 1977).  Here, Phoenix's

28  purposeful refusal and delay in producing documents and responding fully to

JOINT STIPULATION ISO PLAINTIFF'S MOTION TO COMPEL
CV11-09517 ODW (RZx)

1   discovery is completely unjustified.  For months, Plaintiff has made every effort to

2   work in good faith to obtain documents from Phoenix, as set forth in the

3   accompanying Declaration of Khai LeQuang and as summarized above.

4         After six months, Phoenix still has only produced a fraction of the documents

5   that Plaintiff has requested, and Phoenix still has not provided a timetable for

6   further production or explained why, after six months, it has failed to produce key

7   categories of Plaintiff's discovery requests.

8         Phoenix's deliberate attempts to withhold and delay critical discovery in this

9   case are entirely unjustified, much less substantially justified.  Plaintiff is therefore

10  entitled to reimbursement of its expenses and attorneys' fees incurred in making

11  this motion.  Fed. R. Civ. Proc. 37(a)(5); *Global Ampersand, LLC v. Crown Eng'g*

12  *& Const., Inc.*, 261 F.R.D. 495, 502 (E.D. Cal. 2009) (awarding attorneys' fees for

13  discovery misconduct).

14              **B.    Defendant and Opposing Party's Contentions**

15        Compounding its waste of the Court's time by raising phantom or meritless

16  discovery disputes, plaintiff further wastes the Court's time by asking for

17  "reimbursement of its fees and expenses and attorneys' fees incurred in making this

18  motion."  Plaintiff knew, *before* it filed its motion to compel, that Phoenix was

19  close to making a sizeable production that would moot most of the issues raised,

20  including with respect to Request Nos. 73 and 76 through 78.  *See, e.g.*, Gould

21  Decl. ¶¶ 5 & 6; LeQuang Decl. Ex. O.  Ignoring the production, plaintiff

22  improperly filed its motion anyway.  "The serving party should not run to court

23  when the answering party states it will prepare additional responses.  The Federal

24  Rules reflect this policy of asking counsel to resolve discovery disputes among

25  themselves."  *Ayers v. Cont'l Cas. Co.*, 240 F.R.D. 216, 225 (N.D. W. Va. 2007).

26  The Court *should* award reasonable fees and expenses, but the award should be to

27  Phoenix, not plaintiff, for the cost of opposing plaintiff's motion.  *See* Fed. R. Civ.

28  P. 37(a)(5)(B).

1       The Court should not award plaintiff fees or expenses in any event.  In

2   addition to the fact that Phoenix's positions are legally correct – or that there is at

3   least a legitimate difference of opinion regarding the parties' discovery rights and

4   obligations – plaintiff has not demonstrated the existence of any prejudice to itself

5   or other circumstances to warrant such an award.  *See, e.g.*, *J&M Assocs., Inc. v.*

6   *Nat'l Union Fire Ins. Co. of Pittsburgh*, No. CV 06-903, 2008 WL 638137, at *8

7   (S.D. Cal. Mar. 4, 2004) (denying request for monetary sanctions where

8   nonmovant's objections were made in good faith); *Aliotti v. Vessel Senora*, 217

9   F.R.D. 496, 499 (N.D. Cal. 2003) (denying request for monetary sanctions "because

10  the untimeliness was minor and because neither side was ultimately prejudiced").

11  Dated:  July 23, 2012                    ORRICK, HERRINGTON & SUTCLIFFE LLP

14                                                                                */s/ - Khai LeQuang*
                                                                       Khai LeQuang
                                                       Attorneys for Plaintiff
                              US Bank National Association, as securities
                                  intermediary for Lima Acquisition, LP

17  Dated:  July 23, 2012                    JORDEN BURT LLP

19                                                    */s/ - Waldemar J. Pflepsen, Jr.*
                                        Waldemar J. Pflepsen, Jr.
                                        Attorneys for Defendant
                                  PHL Variable Insurance Company